**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Application of Daniel Snyder for an Order Directing Discovery from The Ardent Group, LLC Pursuant to 28 U.S.C. § 1782 | Misc. Action No. _____<br><br>*Ex Parte* Petition for Assistance in Aid of a Foreign Proceeding Pursuant to 28 U.S.C. § 1782 |

Based upon the annexed Declaration of Jordan W. Siev, dated September 15, 2020 ("Siev Decl."), petitioner Daniel Snyder ("Mr. Snyder" or "Petitioner") respectfully petitions this Court *ex parte* for an Order, pursuant to 28 U.S.C. § 1782, compelling The Ardent Group, LLC ("Ardent" or "Respondent"), a limited liability company that does business within this District, to provide discovery for use in a proceeding currently pending in The Republic of India.

### I.   INTRODUCTION

1. Petitioner seeks discovery from Respondent in aid of litigation pending in The High Court of Delhi at New Delhi (the "Indian Court"), bearing the caption *Daniel Snyder Through His SPA Holder vs. Eleven Internet Services LLP & Ors.*, which Petitioner filed on August 7, 2020 (the "Indian Action").

2. Beginning in July 2020, Petitioner—who is well-known as the owner of a professional football franchise in the National Football League, the Washington Football Team—was abruptly subjected to a wave of false and defamatory media articles attacking his reputation. In particular, an Indian entity known as Media Entertainment Arts WorldWide, operating a website at www.meaww.com ("MEAWW"), published several articles falsely accusing Petitioner of sexual misconduct, including sex trafficking and affiliation with sexual predator Jeffrey Epstein.

3. The damage to Petitioner's reputation and his business and personal interests caused by MEAWW's false and defamatory statements was greatly compounded as a result of

MEAWW's defamatory statements quickly spreading across the internet by being linked and/or repeated on many other websites.

4. In addition to filing suit against MEAWW and several individuals linked to MEAWW in the Indian Action, Petitioner has undertaken a substantial investigation into the parties involved in fabricating and arranging publication of MEAWW's defamatory statements—in particular, the reasons for several articles making similar false allegations appearing so close together in time, and the means by which MEAWW's false statements were quickly disseminated and repeated on various websites across the internet, greatly increasing their exposure.

5. The timing of MEAWW's false publications, coupled with other facts known to Petitioner as set forth herein, suggests that the defamatory articles that are the basis for the Indian Action were part of a corrupt misinformation campaign, coordinated with actors based in the United States.

6. Petitioner's investigation has implicated Ardent, an advertising agency that receives payments to promote products, services and intellectual property, including over the internet, as a part of this coordinated effort. Specifically, the main websites that repeated and spread MEAWW's patently false and defamatory allegations concerning Petitioner share key points in common—including that each website features advertisements that are supplied by Ardent, each website includes identical source code in key places, and each was designed by Precision Creations LLC (a Texas headquartered company), whose Founder and CEO also serves as the Founder and CEO of Ardent. This merits discovery regarding Ardent's connection to these websites and knowledge of the coordinated effort to defame Petitioner via MEAWW's articles.

7. Petitioner meets all conditions required to obtain discovery under Section 1782. First, Ardent is present in this judicial district, as its principal place of business is located in

Manhattan.  Second, Petitioner seeks information from Ardent specifically tailored to support his claims in the Indian Action.  Third, because Petitioner is a litigant in the Indian Action, he is certainly an "interested person" for purposes of Section 1782.

8. Moreover, the prudential considerations which the Supreme Court has encouraged district courts to consider when faced with a request for discovery under Section 1782 also favor granting the discovery Petitioner seeks.  Ardent is not a party to the Indian Action; neither the nature of the Indian Action nor the disposition of the court hearing would militate against the use of discovery obtained in this proceeding; Petitioner's request is not intended to circumvent any foreign or domestic restrictions on discovery; and the material Petitioner seeks consists of readily-obtainable business records, and thus is not unduly burdensome.

9. Notably, two other district courts have recently granted Petitioner's requests for Section 1782 discovery in aid of the Indian Action against parties also believed to be involved in the corrupt misinformation campaign being waged against Petitioner.  *In re Application of Daniel Snyder for an Order Directing Discovery from New Content Media Inc. d/b/a MEA WorldWide Pursuant to 28 U.S.C. § 1782* (C.D. Cal., Misc. Action No. 2:20-mc-00076); *In re Application of Daniel Snyder for an Order Directing Discovery from Mary Ellen Blair and Comstock Holding Companies, Inc. Pursuant to 28 U.S.C. § 1782* (E.D.Va. Misc. Action No. 1:20-mc-00023-LO-TCB).

10. For these reasons and on the basis of the facts set forth fully herein, Petitioner respectfully seeks an order permitting him to take discovery from Ardent, via the Subpoenas attached hereto, in support of the Indian Action.

## II.   PARTIES

11.   Petitioner Daniel Snyder is a businessman and philanthropist best known for his majority ownership of the Washington Football Team, and is an adult individual and a resident of the state of Maryland.

12.   Respondent The Ardent Group, LLC is a limited liability company organized under the laws of Texas and with its principal place of business at 450 Park Avenue South, New York, New York, specializing in advertising services.

## III.   JURISDICTION AND VENUE

13.   This Court has subject matter jurisdiction over this application under 28 U.S.C. §§ 1331 and 1782.  This Court has personal jurisdiction over Ardent because it conducts business in this judicial district: Ardent maintains an office at 450 Park Avenue South, 3rd Floor, New York, NY 10016.

14.   Under 28 U.S.C. §§ 1391(c)(2) and 1782, venue is proper in this Judicial District because Ardent is subject to this Court's personal jurisdiction, due to its presence herein.

## IV.   THE INDIAN ACTION

15.   Petitioner has asserted a claim for defamation *per se* in the Indian Court against Indian company Eleven Internet Services LLP, and its Indian subsidiary MEAWW, as well as Indian residents Anay Chowdhary ("Anay") and Nirnay Chowdhary ("Nirnay"), Prarthna Sarkar ("Sarkar") and Jyotsna Basotia ("Basotia").

16.   MEAWW purports to be, and holds itself out as, a news website.  MEAWW publishes "news" stories regarding a broad variety of matters, including pop culture, law and government, and media and entertainment.

17. In reality, however, rather than being a legitimate news source and reporter, MEAWW intentionally sows disinformation at the behest of its undisclosed clients, including governments and intelligence services, and is often hired by clients that are cloaked behind several layers of anonymous corporate entities. MEAWW thus acts as a hired agent of these unnamed entities to knowingly spread, among other things, false and defamatory statements concerning its clients' rivals.

18. MEAWW has worldwide reach, as it publishes globally via the internet and receives internet traffic from the United States, India, and many other countries around the world. It has touted itself as having more than 150 million unique users and more than 1 billion page views per month.

19. On or about July 16, 2020, MEAWW posted several false and wholly fabricated articles — written by Sakar and Basotia, and published at the direction of the Chowdhary brothers — regarding Petitioner, which falsely accuse him of a broad array of acts of criminal sexual misconduct including, among other things, involvement in sex trafficking, and affiliating with sexual predator Jeffrey Epstein (collectively, the "Defamatory Articles").

20. These included "Washington Redskins owner Dan Snyder faces sex trafficking allegations; Internet says, 'He was on Epstein's list," published at https://meaww.com/washington-redskins-owner-dan-snyder-to-step-down-owing-to-sex-trafficking-allegations-fan-reaction (the "First Defamatory Article"). The First Defamatory Article falsely states that Mr. Snyder "has found himself in trouble yet again and this time it's allegedly for sex trafficking. The minority owners [of the Washington Football Team] are apparently looking at bringing him down citing inappropriate and unchaste behavior as one of the major reasons." The First Defamatory Article went on to publish utterly baseless speculation

regarding whether a then-forthcoming *Washington Post* article about the Washington Football Team "would be about [Snyder's] alleged involvement in sex trafficking[,]" quoting several anonymous posters from the internet forum Reddit.com, including baselessly quoting that "[Snyder] is getting [arrested] for sex trafficking. He was on [Jeffrey] Epstein's list too." *Id.*

21. MEAWW published a second article on July 16, 2020: "#RedskinsScandal: Will Dan Snyder rename Washington Redskins the 'Epsteins'? Angry Internet screams 'throw him out," published at https://meaww.com/washington-redskins-dan-snyder-jeffrey-epstein-sexual-harrasment-sex-trafficking-scandal-name-change (the "Second Defamatory Article," and together with the First Defamatory Article, the "Defamatory Articles").  The Second Defamatory Article refers to, and repeats, the false allegations of the First Defamatory Article: namely, the false claims that Mr. Snyder is linked to sexual predator Jeffrey Epstein and that Mr. Snyder is or was involved in sexual misconduct, including sexual harassment and/or sex trafficking.

22. These blatantly false and wholly fabricated articles purport to be factual news stories, but were and are utterly untrue and have no legitimate journalistic basis whatsoever.

23. However, although MEAWW publicly named "the internet" as its source for the false and libelous statements in the Defamatory Articles, upon information and belief certain unknown individuals with a clear intent to defame Petitioner furnished the defendants in the Indian Action with false and unsubstantiated claims regarding Mr. Snyder in connection with MEAWW's drafting of the Defamatory Articles.

24. The statements that MEAWW published about Mr. Snyder are categorically false. Moreover, the defendants in the Indian Action published these defamatory, inflammatory statements about Mr. Snyder with deliberate intent to damage Mr. Snyder, or at best, complete disregard for their basis in fact.

25. Although MEAWW reluctantly removed the Defamatory Articles after Petitioner demanded their immediate removal, the damage to Mr. Snyder's reputation had already been done.

26. Mr. Snyder's children and other family members, and numerous of Mr. Snyder's friends, neighbors, and business associates, were exposed to the Defamatory Articles, either by directly viewing the Defamatory Articles online or by receiving word of the Defamatory Articles. Consequently, Mr. Snyder's reputation and good standing has been severely harmed, and will continue to be harmed, by the Defamatory Articles, and the members of Mr. Snyder's family have been severely harmed due to the publication of these lies on behalf of hidden third-party clients of Respondent.

27. The false allegations that the defendants in the Indian Action have seeded on the internet have taken root beyond MEAWW itself. For instance, on or about July 16, 2020 – not coincidentally, the very same day that MEAWW published the Defamatory Articles at issue herein – the following appeared on a Twitter account that has been confirmed as a fake account existing for no purpose other than to propagate false and misleading information:

> According to insiders and anonymous Washington Post employees, the [upcoming] article will allege that: Dan Snyder abuses drugs and alcohol[;] Snyder paid off refs. Some refs have made $2 million from him. And Snyder is not the only team owner paying off refs.  Others do it too.  Snyder and former Redskins coach Jay Gruden, brother of Jon Gruden, pimped out their cheerleaders to season ticket holders while holding their passports from them in a foreign country.  Jay Gruden and then Redskins running back Kapri Bibbs were sleeping with the same woman.  When Jay found out, he got petty and benched Bibbs.  During that game when Bibbs was on the bench, Bibbs' replacement missed a block and that resulted in quarterback Alex Smith suffering a broken leg.  Alex hasn't been able to play football ever since[.]  Snyder and Gruden would hold sex parties with rampant drug usage and some sexual assaults[.]   Snyder held nude photoshoots with the Redskins cheerleaders[.]  Lawyers are already involved[.]

Whether this account is one of the "bots" utilized regularly by MEAWW to further propagate its for-profit lies, or written by a human agent of MEAWW, will be further elucidated through discovery sought herein.

28.     Petitioner commenced the Indian Action on August 7, 2020, asserting claims for defamation per se arising out of the Defamatory Articles. Petitioner seeks damages of $10 million.

### V.     ARDENT IS DEMONSTRABLY CONNECTED WITH MEAWW'S FALSE AND DEFAMATORY ARTICLES

29.     Ardent describes itself as "a full service advertising agency," and touts is connections to its "top-tier network of sites." Ardent further offers its customers services to "find and engage their audience nationwide," including providing "state-of-the-art websites, **access to premium content**, unique creatives and unparalleled monetization to grow your audience and revenue." (emphasis added). *See* Siev Decl., Ex. I.

30.     Upon information and belief, the Defamatory Articles constituted part of the so-called "premium content" that Ardent offered to its customers, suggesting that Ardent had a direct financial interest in the dissemination of the Defamatory Articles.

31.     Indeed, <u>immediately</u> after MEAWW published the Defamatory Articles, they were picked up and rapidly spread in nearly identical form by a network of interrelated websites.

32.     Each of the websites in this related network: (i) promote politically conservative media personalities; (ii) are all designed by the same web design company, Precision Creations LLC ("<u>Precision</u>"); and (iii) contained identical advertisements, undoubtedly placed through Ardent.

33.     One such website in this network is WayneDupree.com, which claims to reach 800,000 to 1,000,000 page views per month. *See* https://www.waynedupree.com/about/. Another is LifeZette.com, which claimed to have more than 20,000,000 page views as of February

2017. *See* https://www.lifezette.com/wp-content/uploads/2017/02/LifeZette-Media-Kit-February-06-2017.pdf  Precision prominently features WayneDupree.com and LifeZette.com in its "Meet a few of our clients" section.  *See* Siev Decl., Ex. C.

34. On July 16, 2020, immediately after the Defamatory Articles were posted on MEAWW, WayneDupree.com published an article titled "Internet Sleuths Accuse 'Redskins' Owner Dan Snyder of 'Sex Trafficking' and Epstein Ties After WAPO Bombshell Drops," published at https://www.waynedupree.com/2020/07/dan-snyder-epstein-redskins-sex-traffic/ ("Wayne Dupree Article URL").  The article, purportedly authored by "Missy Crane," excerpted four paragraphs from MEAWW's piece, a link to the Washington Post article, and embedded content from two other Twitter users.  *See* Siev Decl., Ex. D.

35. The WayneDupree.com article was then republished verbatim in short succession by four sites that also are part of the apparent Ardent network, including LifeZette.com, RobManess.com, DrewBerquist.com, and SteveGruber.com.  *See* Siev Decl., Exs. E - H. The content regarding the Defamatory Articles on all four sites is identical or nearly identical. In republishing the Wayne Dupree article, each of these sites openly identified Wayne Dupree as the content source and linked directly to the Wayne Dupree Article URL. The latter three sites even included the same artwork with the story — a photo of Petitioner in front of a Washington Redskins logo and a teal background.

36. Further, each of these websites features identical advertising, undoubtedly placed by Ardent.  Each of these websites contains an "ADVERTISE WITH US" link in the footers of their page designs that, in turn, leads to the "Contact" page on Ardent's website (https://theardent.group/#contact). A prospective advertiser seeking to post ads on LifeZette.com, RobManess.com, DrewBerquist.com, or SteveGruber.com would need to contact Ardent to

arrange placement. Further, Ardent's "Contact" page displays Respondent's 450 Park Avenue South, 3rd Floor, New York, NY 10016.

37. Notably, it is a matter of public record that Ardent's "Founder/CEO" is Joshua Wychopen. *See* https://www.linkedin.com/in/joshwychopen/. Mr. Wychopen's LinkedIn profile also states that he is the "Founder/CEO" of website design company Precision. *Id.* As noted, **all** of the websites that helped distribute the Defamatory Articles were designed by Precision, and publicly advertise this fact in the footer of their pages, which reads "DESIGNED & DEVELOPED BY PRECISION CREATIONS," and in turn link to https://www.precisioncreations.com/.

38. As such, there is ample reason to conclude that Ardent is linked to the Defamatory Articles and to those responsible for spreading them. Consequently, Ardent likely possesses information regarding the publication and dissemination of the Defamatory Articles, which would go directly to the merits of Petitioner's claims in the Indian Action.

### VI. Discovery Requested

39. Upon information and belief, Respondent is in possession, custody, and/or control of significant documentary information — including emails, text messages, electronic and physical notes, call records, and other documents — that would demonstrate its connections to MEAWW, other third parties hostile to Petitioner, and the coordination between each of the foregoing to disparage and defame Petitioner — all of which is currently at issue in the Indian Action. Accordingly, Respondent possesses documents and information that bear directly upon the issues in the Indian Action and which Petitioner would be unable to obtain through discovery in the Indian Action.

40. As set forth in further detail in the subpoenas, Petitioner seeks discovery concerning (1) any communications or documents exchanged between Ardent, on the one hand, and

MEAWW, its affiliates, agents and employees, on the other hand; (2) documents concerning any financial incentives, payments, or other compensation that Ardent received in connection with the Defamatory Articles; (3) communications between Ardent and any third parties concerning the Defamatory Articles; (4) other documents and information that are relevant to the Indian Action and are available solely through Respondent.

41. In addition to requests for the production of documents from Ardent, Petitioner seeks to depose Ardent concerning the subject matters described above and in the subpoena *ad testificandum* directed to it.

### VII.   PETITIONER IS ENTITLED TO THE DISCOVERY SOUGHT HEREBY

42. 28 U.S.C. § 1782(a) provides, in pertinent part:

   a. The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal . . . . The order may be made pursuant to a letter rogatory issued, or request made, by a foreign or international tribunal or upon the application of any interested person and may direct the testimony or statement be given, or the document or other thing be produced, before a person appointed by the court.

43. Since 1948, "Congress [has] substantially broadened the scope of assistance federal courts could provide for foreign proceedings," pursuant to Section 1782. *See Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 256-57 (2004).

44. Further, this Court has expressly recognized that Section 1782 imposes a "liberal" standard for discovery in aid of foreign proceedings, generous to the applicant. *See In re Fund for Prot. of Inv'r Rights in Foreign States Pursuant to 28 U.S.C. § 1782*, 19 Misc. 401 (AT), 2020 U.S. Dist. LEXIS 119816, at *11 (S.D.N.Y. July 8, 2020); *see also In re Porsche Automobil Holding SE*, 15-MC-417 (LAK), 2016 U.S. Dist. LEXIS 20012, at *39 (S.D.N.Y. Feb. 18, 2016)

("it was relatively evident from precedent in this circuit generous to Section 1782 applicants that there was a reasonable chance [respondents] would have to produce documents . . . .").

45. "[A] district court is authorized to assist a foreign or international tribunal or a litigant before such a tribunal by ordering discovery where (1) the person from whom discovery is sought resides or is found in the district; (2) the discovery is for use in a proceeding before a foreign tribunal; and (3) the application is made by a foreign or international tribunal or 'any interested person.'" *In re Microsoft Corp.*, 428 F.Supp.2d 188, 192 (S.D.N.Y. 2006) (quoting *Schmitz v. Bernstein, Liebhard & Lifshitz, LLP*, 376 F.3d 79, 83 (2d Cir. 2004)).  Each of these statutory requirements is met here.

46. First, Ardent can be "found" in this district, on the basis that its principal place of business is located in Manhattan.  Siev Decl., Ex. I.  Indeed, prospective advertisers seeking to place ads on the sites that published the Defamatory Articles are directed to contact Ardent's Manhattan office.

47. Second, the discovery sought from Ardent is intended for use in the Indian Action. A true and correct copy of the pleadings filed in the Indian Action is attached to the Siev Decl. as Exhibit J**.**  As review of the discovery requested herein demonstrates, the materials sought relate to Ardent's connection to MEAWW, the Defamatory Articles, the dissemination of the Defamatory Articles, and Ardent's links to other persons and entities that Petitioner has reason to believe were involved in the campaign to defame him.  *See* Siev Decl., Ex. A & B (proposed subpoenas to Ardent).

48. Third, Petitioner is an "interested person" within the meaning of 28 U.S.C. § 1782. An interested person is one who has significant "participation rights" in the foreign action.  *Intel*, 542 U.S. at 256-57.  As the Supreme Court noted in *Intel*, "litigants are included among, and may

be the most common example, of the 'interested person[s]' who may invoke § 1782." 542 U.S. at 256.  Petitioner is the plaintiff in the Indian Action, and therefore is an "interested person" for the purposes of § 1782.

49. Once the statutory requirements of 28 U.S.C. § 1782 are met, the district court is free to grant discovery in its discretion.  *See Schmitz*, 376 F.3d at 83.  Such discretion is to be guided by the "twin aims of the statute: providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign countries by example to provide similar means of assistance to our courts."  *Id.* at 84.

50. The Supreme Court has identified a number of prudential factors for courts to consider when ruling on a Section 1782 application: (1) whether the person from whom discovery is sought is a participant in the foreign proceeding; (2) the nature of the foreign tribunal, the character of the foreign proceeding, and the receptivity of the foreign court to federal-court assistance; (3) whether the application conceals an attempt to circumvent foreign proof-gathering restrictions of a foreign country; and (4) whether the application is unduly intrusive or burdensome. *See Intel*, 542 U.S. at 264-65; *Mees v. Buiter*, 793 F.3d 291, 298 (2d Cir. 2015) (quoting *id.*).  Here, all of these factors weigh in favor of granting the application.

51. *First*, where, as here, discovery is sought from a person or entity that is not a party to the foreign proceeding, the need for court-ordered discovery is apparent.  As the Supreme Court explained: "[a] foreign tribunal has jurisdiction over those appearing before it, and can itself order them to produce evidence.  In contrast, nonparticipants in the foreign proceeding may be outside the foreign tribunal's jurisdictional reach; hence, their evidence, available in the United States, may be unobtainable absent § 1782 aid." *Intel*, 542 U.S. at 264 (internal citations omitted).  Ardent is not a party to the Indian Action and, upon information and belief, has no legal presence in India.

As such, Ardent is outside the jurisdictional reach of the Indian Court. Without relief from this Court, Petitioner would be unable to obtain evidence from Ardent critical to his defamation claims in the Indian Action.

52. **Second**, courts must look to the nature of the foreign proceeding and the receptivity of the foreign tribunal to federal court assistance. Here, there is no evidence that the discovery sought in this application would offend the Indian Court in any way. To the contrary, the discovery sought would further highlight the lack of truth in the Defamatory Articles, and illuminate the authors' bad-faith intent in publishing the Defamatory Articles and amplifying its dissemination worldwide, goals which are directly relevant to the Indian Action.

53. **Third**, this application is not an attempt to circumvent any foreign discovery restrictions and does not violate any Indian restrictions on gathering evidence.[1] Petitioner has a good-faith basis for believing that he will be able to use these materials in the Indian Action. Further, Petitioner has no reason to believe that the Indian Court would be unreceptive to the judicial assistance requested, nor is Petitioner aware of any limitation on discovery imposed by the Indian Court or the law of India, either generally or specifically, such that the request would "circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States." *Intel*, 542 U.S. 241 at 264-65. The Court's assistance, through granting the discovery sought herein, would permit Petitioner to appropriately and fully prosecute his claims in the Indian Action.

---

[1] As the Supreme Court noted in *Intel*, the Court's analysis of a Section 1782 application does not extend to the discoverability or admissibility of the information in the foreign forum. *See Intel*, 542 U.S. at 260 ("Beyond shielding material safeguarded by an applicable privilege, however, nothing in the text of § 1782 limits a district court's production-order authority to materials that could be discovered in the foreign jurisdiction if the materials were located there.").

54. ***Fourth***, the document requests in the proposed subpoenas are neither unduly burdensome nor intrusive. Petitioner has tailored his requests to seek only those materials relevant to the Indian Action. Furthermore, the documents requested are ordinary business records, and a sophisticated entity such as Ardent should have little difficulty identifying them, reviewing them, and producing them.

## VIII.  CONCLUSION

For the reasons set forth herein, Petitioner respectfully requests that the Court issue an Order, pursuant to 28 U.S.C. § 1782, granting Petitioner leave to serve Ardent with the subpoenas appended to the Siev Decl. as Exhibits A and B.

Dated: September 15, 2020
New York, New York

REED SMITH LLP

By: _/s/ Jordan W. Siev_____
Jordan W. Siev
Casey D. Laffey

599 Lexington Avenue, 22nd Floor
New York, NY 10022
Tel: (212) 521-5400
jsiev@reedsmith.com
claffey@reedsmith.com

TACOPINA, SEIGEL & DEOREO, P.C.
Joseph Tacopina
Chad D. Seigel
275 Madison Avenue, 35th Floor
New York, NY 10016
jtacopina@tacopinalaw.com
cseigel@tacopinalaw.com

*Attorneys for Petitioner
  Daniel Snyder*